USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: September 22, 2015

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

```
---------------------------------------------------X
                                                   :
WILLIAM DORIA,                                     :
                                                   :
                                   Plaintiff,      :        14 Civ. 7476 (KPF)
                                                   :
                   v.                              :        OPINION AND ORDER
                                                   :
CAROLYN COLVIN,                                    :
                                                   :
                                   Defendant.      :
                                                   :
---------------------------------------------------X
```

KATHERINE POLK FAILLA, District Judge:

Plaintiff William Doria filed this action pursuant to Section 205(g) of the Social Security Act (the "Act"), 42 U.S.C. § 405(g), seeking review of a decision by the Acting Commissioner of Social Security ("the Commissioner") denying Doria's application for Supplemental Security Income ("SSI") and Social Security Disability Insurance benefits ("DIB") based on a finding that Doria did not meet the Act's criteria for disability. Doria has filed a motion for summary judgment, and the Commissioner has filed a cross-motion for judgment on the pleadings. Because the administrative law judge (the "ALJ") at Doria's hearing (i) did not conduct an adequate assessment of Doria's credibility in regards to his reports of physical pain, and (ii) declined to employ a vocational expert despite finding significant nonexertional limitations upon Doria's ability to work, Doria's motion is granted, the Commissioner's motion is denied, and the case is remanded for a rehearing.

**BACKGROUND**[1]

A.   **Doria's Physical and Social Background**

William Doria, born on January 24, 1963, claims disability as of December 14, 2009.  (SSA Rec. 124).  Doria bases his claim on a combination of alleged physical and mental impairments: chronic pain and weakness in his left arm, neck, and back (*id.* at 46, 54-57, 67-68, 147); and anxiety, social phobia, and depression (*id.* at 50, 65-66, 147).  Doria is a marble installer by trade, and had performed that work for thirty years.  (*Id.* at 56).  In 2002, Doria fell from a fence while out with his children and landed on his left shoulder. (*Id.* at 40, 54).  His left arm immediately went "diffusely numb and weak," and a subsequent MRI of his shoulder indicated deep bruising of his humerus and damage to the tendons in his shoulder, while MRI images of his cervical spine indicated "reversal of the normal cervical lordosis with a bulging disc at C5-6." (*Id.* at 40).[2]  His examining physician, Doctor Thomas Lansen, further noted slightly limited flexion and extension of Doria's neck, significantly limited left lateral flexion of his neck, and significant upper extremity weakness on his left side.  (*Id.* at 41).

After his injury, Doria returned to his work installing marble, which required him to lift slabs of marble weighing 10 to 20 pounds.  (SSA Rec. 56).

---

[1]   The facts contained in this Opinion are drawn from the Social Security Administrative Record ("SSA Rec.") (Dkt. #7) filed by the Commissioner.  For convenience, Plaintiff's supporting memorandum (Dkt. #13) is referred to as "Pl. Br.," and Defendant's supporting memorandum (Dkt. #17) as "Def. Br."

[2]   Lordosis refers to the inward curve of the spine; hence "reversal of the normal cervical lordosis" would mean that the normal curvature of the spine in an individual's neck was reversed.  *Lordosis*, MedlinePlus, https://www.nlm.nih.gov/medlineplus/ency/article/003278.htm (last visited on Sept. 17, 2015).

Sometime between 2007 and 2008, while still working at this job, Doria began experiencing recurrent pain in his left arm, shoulder, and neck. (*Id.* at 56-57). In 2009 the pain and weakness in Doria's left arm caused his employer to place him on "light duty" (*id.* at 55), and in December of 2009 the pain forced Doria to stop working altogether (*id.* at 45). Doria lacked health insurance after losing his job, but he sought treatment at the free clinic at the Sound Shore Medical Center in New Rochelle, New York, when the pain became too great for him to ignore. (*Id.* at 57-58). Doria takes Neurontin for nerve pain, as well as Tylenol, and, when his pain becomes severe, Oxycodone. (*Id.* at 60-61).

In addition to these physical limitations, Doria also asserts a history of psychiatric impairments. (*See* SSA Rec. 45, 48, 50, 59-60, 65-70, 147, 150, 163, 166-68). At his administrative hearing, Doria testified that he had been diagnosed with agoraphobia, and that he becomes "semi-paralyzed" when he goes out into the general public. (*Id.* at 50). He stated that he has a few close friends with whom he tries to socialize regularly, that he will sometimes go to cafés to meet them, and that he attends weekly church services. (*Id.* at 50-52). Doria further stated that whenever he goes to a public place — a café, church, or the public transit system — he has to do so with a friend, as he becomes overwhelmed with fear if he goes alone. (*Id.* at 66-68).

The record contains reports from Doria's voluntary outpatient treatment for anxiety, depression, and alcohol dependency, for which he checked into St. Vincent's Hospital in July 2008. (SSA Rec. 213-26). His hospital intake report also recites that he had been experiencing progressively worsening anxiety and

depression, which were likely compounded by the loss of his job and his consequent loss of health insurance, which in turn led him to not receive medication. (*Id.* at 214-15). The intake report further stated that Doria had a history of alcohol and cannabis abuse, but that he was an active and dedicated participant in Alcoholics Anonymous ("AA") meetings and found them to be useful. (*Id.* at 214, 217, 219-26). At times he reported strong suicidal thoughts, at one point going so far as to put a cord around his neck before stopping and calling a family member for support. (*Id.* at 222). Doria's examining physician described him as "very motivated to attain sustained abstinence" from marijuana and alcohol, and reported that Doria found the coping skills taught at group therapy to be very helpful. (*Id.* at 223-24).

Doria has been seeing Doctor Michael Hargrove since August 2008 for depression and anxiety (SSA Rec. 150), and in 2009 Dr. Hargrove diagnosed Doria with recurrent and severe major depressive disorder; panic disorder and agoraphobia; and alcohol dependence (*id.* at 233). Dr. Hargrove's treatment notes report Doria's significant struggle with these conditions, but also indicate marked improvement with medication. (*Id.* at 226-35). A Medical Source Statement form filled out by Dr. Hargrove in January 2012 indicates moderate impairment of Doria's ability to understand, remember, and carry out simple instructions, as well as of his ability to make judgments on simple work-related decisions. (*Id.* at 236). Dr. Hargrove indicated marked limitations on Doria's ability to understand, remember, and carry out complex instructions, and on his ability to make more complex work-related decisions. (*Id.*). Dr. Hargrove

4

also observed a marked limitation on Doria's ability to interact appropriately with the public, and a moderate limitation on his ability to interact appropriately with co-workers and supervisors, all stemming from Doria's "vague paranoia" and "social phobia." (*Id.* at 237).

## B.    Consultative Examinations

The record contains reports from two consultative examinations, one physical and one psychiatric, ordered by the Commissioner. (SSA Rec. 178-86). Doctor Dmitri Bougakov conducted the psychiatric evaluation on November 8, 2011. (*Id.* at 178). Dr. Bougakov reported mild impairment of Doria's attention, concentration, and memory, all due to his anxiety, and noted that Doria has a family history of depression and anxiety, including an uncle who committed suicide. (*Id.* at 179-80). Dr. Bougakov diagnosed Doria with recurrent major depressive disorder and panic disorder with agoraphobia, as well as cervical spine pathology. (*Id.* at 180-81). His prognosis was "[f]rom guarded to fair, given the fact that [Doria] does present with mild, but acute, symptoms of anxiety and presents with mild cognitive limitations that are likely to be related to his depressive and anxiety symptoms." (*Id.* at 181).

The physical examination, conducted by Dr. Barbara Akresh, occurred on November 10, 2011. (SSA Rec. 182). Dr. Akresh noted Doria's self-report of a previous neck injury, sustained approximately 15 years ago, and of neck pain radiating from the left side of his neck to his thumb and forefinger that began approximately six months ago. (*Id.*). Dr. Akresh additionally noted that Doria had been referred to Sound Shore Medical Center's Neurology Clinic, and had

an appointment there pending.  (*Id.*).[3]  Dr. Akresh's physical examination of Doria exposed no abnormalities, save pain with cervical spine movement to the left and some tenderness of the left trapezius and paraspinal muscles.  (*Id.* at 184-85).  Doria "[had full strength] in the upper and lower extremities except for slightly weaker in the left biceps," and his grip and finger dexterity were both intact.  (*Id.* at 185).  Dr. Akresh diagnosed Doria with, *inter alia*, a history of head and neck injury and probable herniated disks in his cervical spine, and assessed Doria's prognosis as "fair."  (*Id.*).  Final notations on Dr. Akresh's report indicate

> moderate limitations in [Doria's] ability to lift and carry heavy objects with the left arm secondary to the history of weakness as well as probable herniated disks of the cervical spine.  More information should be obtained from his medical records after he has his neurology consult and possible repeat MRI.

(*Id.* at 185-86).

## C.    The ALJ's Opinion Denying Benefits

In finding that Doria did not qualify for Social Security benefits, the ALJ followed a five-step inquiry for the evaluation of disability claims.  *See* 20 C.F.R. § 404.1520(a)(1).[4]  As a threshold matter, the ALJ found that Doria met

---

[3]    The record contains no reports or other evidence to indicate whether this appointment occurred, and if so, what the scheduled imaging indicated.

[4]    The Second Circuit has described the five-step analysis as follows:

> First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.  If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.  If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an

the insured status requirements of the Act through December 31, 2014,
meaning that Doria would need to establish disability on or before that date.
(SSA Rec. 15).[5]  The ALJ then proceeded to find that Doria satisfied the first
two steps on the disability analysis: (i) he had not engaged in substantial
gainful activity since the onset date of his alleged disability, and (ii) he had
severe medically determinable impairments — recurrent major depressive
disorder and panic disorder with agoraphobia — as well as "non-medically
determinable impairments."  (*Id.*).  In explaining these latter impairments, the
ALJ stated that Doria had "alleged a history of trauma to the neck and
shoulders," but found "no objective medical evidence to support any related
impairments."  (*Id.*).

At the third step of the inquiry, the ALJ found that Doria lacked an
impairment or combination of impairments that met or medically equaled the
severity of a listed impairment in 20 C.F.R. § 404, Subpart P, Appendix 1, the
presence of which would allow Doria to presumptively qualify as disabled.
(SSA Rec. 16).  The ALJ particularly considered the listings for Affective

---

impairment, the Commissioner will consider him [*per se*]
disabled.... Assuming the claimant does not have a listed
impairment, the fourth inquiry is whether, despite the claimant's
severe impairment, he has the residual functional capacity to
perform his past work. Finally, if the claimant is unable to perform
his past work, the Commissioner then determines whether there is
other work which the claimant could perform.

*Selian* v. *Astrue*, 708 F.3d 409, 417-18 (2d Cir. 2013) (quoting *Talavera* v. *Astrue*, 697
F.3d 145, 151 (2d Cir. 2012)).  "The claimant bears the burden of proving his or her
case at steps one through four," while the Commissioner bears the burden at the final
step.  *Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).

[5]   *See* 42 U.C.S. § 423(c) (setting forth insurance definitions and requirements for
disability claimants).

Disorders and Anxiety-Related Disorders and found that while Doria did have "somewhat impaired concentration" and "some debilitating social functioning issues," he did not have limitations or symptoms sufficient to satisfy the Mental Disorders Listings in 20 C.F.R. § 404, Subpart P, Appendix 1. (*Id.*).[6]

The ALJ next determined that Doria retained the residual functional capacity ("RFC") to perform "medium work consisting of simple, routine, and repetitive tasks with no production requirements or quotas," so long as such work was isolated, with only occasional interaction with coworkers and no interaction with the public. (SSA Rec. 16).  To make this determination, the ALJ used a two-step process to establish the weight warranted by Doria's self-reported restrictions:  First, he considered whether an underlying medically determinable mental impairment could reasonably be expected to produce Doria's symptoms; second, once such an impairment was established, the ALJ evaluated the intensity, persistence, and limiting effects of Doria's symptoms to determine the extent to which they limited his functioning.  (*Id.* at 16-17 (tracking 20 C.F.R. § 404.1529)).  The ALJ found that Doria did indeed have underlying mental impairments that could reasonably produce his other symptoms, as Dr. Hargrove had previously diagnosed Doria with major depressive order, panic disorder with agoraphobia, and alcohol dependence. (SSA Rec. 17).  He proceeded to find, however, that Doria lacked credibility to

---

[6]     In order to qualify as *per se* disabled due to a mental disorder under 20 C.F.R. § 404, Subpart P, Appendix 1, a claimant must demonstrate two of the four following conditions:  Marked restriction in activities of daily living; marked difficulty in maintaining social relationships; marked difficulty in maintaining concentration, persistence, or pace; and episodes of decompensation of extended duration.

the extent that Doria claimed disability as a result of his mental impairments, because (i) "[e]ven though he stated at his psychological consultative examination that he had been depressed from 1978 through 2009, he was able to work during that entire period of time," (ii) his September 2011 report showed that he "has a friend who walks and feeds his dog, he leaves his house once a day, he has a friend who does his yard work and prepares his meals, he meets others for coffee and he has no problems getting along with his family," and (iii) he seemed to be doing well in treatment. (*Id.* at 17-18).

Despite finding that Doria possessed the RFC to perform a subset of medium work, the ALJ stated that Doria could not perform his previous work as a marble worker "because it [was] too mentally demanding." (SSA Rec. 18). Because Doria could not perform his past relevant work, the ALJ then proceeded to consider whether, given Doria's age, education, job skills, and RFC, jobs existed in significant numbers in the national economy that Doria could perform. (*Id.* (citing 20 C.F.R. §§ 404.1569, 404.1569(a))). The ALJ stated that if Doria "had the residual functional capacity to perform the full range of medium work ... a finding of 'not disabled' would be directed by Medical-Vocational Rule 203.29 and Rule 203.22. However, the additional limitations have little or no effect on the occupational base of unskilled medium work," and a finding of "'not disabled' is therefore appropriate." (*Id.* at 19 (citing Social Security Rulings ("SSR") 85-15, 96-9(p))). The ALJ thus determined that Doria did not qualify as disabled under the Act, and was consequently not entitled to benefits under the same. (*Id.*).

**D.      Doria's Appeal from the ALJ's Denial**

On April 9, 2013, Doria filed a request for review of the ALJ's decision. (SSA Rec. 8).  The Appeals Council responded on July 22, 2014, finding no reason for review and consequently denying Doria's request.  (*Id.* at 1).

Doria has now filed for relief in this Court.  He initiated the present action on September 16, 2014 (Dkt. #1), and the Commissioner filed the Administrative Record and her answer on February 9, 2015 (Dkt. #6-7).  The parties then proceeded to file competing motions for pretrial adjudication: Plaintiff filed a motion for summary judgment on March 11, 2015 (Dkt. #12-13), and the Commissioner filed a cross-motion for judgment on the pleadings on April 27, 2015 (Dkt. #16-17).

**DISCUSSION**

**A.      Applicable Law**

**1.      Motions Under Federal Rules of Civil Procedure 12(c) and 56(a)**

Federal Rule of Civil Procedure 12(c) provides that "[a]fter the pleadings are closed — but early enough not to delay trial — a party may move for judgment on the pleadings."  Fed. R. Civ. P. 12(c).  The standard applied to a motion for judgment on the pleadings is the same as that used for a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6).  *Sheppard* v. *Beerman*, 18 F.3d 147, 150 (2d Cir. 1994); *accord L-7 Designs, Inc.* v. *Old Navy, LLC*, 647 F.3d 419, 429 (2d Cir. 2011).  When considering either type of motion, a court should "draw all reasonable inferences in Plaintiffs' favor, assume all well-pleaded factual allegations to be true, and determine whether they plausibly

give rise to an entitlement to relief." *Faber* v. *Metro. Life Ins. Co.*, 648 F.3d 98, 104 (2d Cir. 2011) (internal quotation marks omitted) (quoting *Selevan* v. *N.Y. Thruway Auth.*, 584 F.3d 82, 88 (2d Cir. 2009)).  A plaintiff is entitled to move forward with his case if he alleges "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp.* v. *Twombly*, 550 U.S. 544, 570 (2007); *see also In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 (2d Cir. 2007) ("[W]hile *Twombly* does not require heightened fact pleading of specifics, it does require enough facts to nudge [plaintiff's] claims across the line from conceivable to plausible." (internal quotation marks omitted)).

Under Fed. R. Civ. P. 56(a), summary judgment may be granted only if all the submissions taken together "show[] that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." *See Celotex Corp.* v. *Catrett*, 477 U.S. 317, 322 (1986); *Anderson* v. *Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  The moving party bears the initial burden of demonstrating "the absence of a genuine issue of material fact." *Celotex*, 477 U.S. at 323.  A fact is "material" if it "might affect the outcome of the suit under the governing law," and is genuinely in dispute "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248; *see also Jeffreys* v. *City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (citing *Anderson*).  The movant may discharge this burden by showing that the nonmoving party has "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at

11

322; *see also Selevan*, 711 F.3d at 256 (finding summary judgment appropriate where the non-moving party fails to "come forth with evidence sufficient to permit a reasonable juror to return a verdict in his or her favor on an essential element of a claim" (internal quotation marks omitted)).

If the moving party meets this burden, the nonmoving party must "set out specific facts showing a genuine issue for trial" using affidavits or otherwise, and cannot rely on the "mere allegations or denials" contained in the pleadings. *Anderson*, 477 U.S. at 248, 250; *see also Celotex*, 477 U.S. at 323-24; *Wright* v. *Goord*, 554 F.3d 255, 266 (2d Cir. 2009). The nonmoving party "must do more than simply show that there is some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co.* v. *Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (internal quotation marks omitted), and cannot rely on "mere speculation or conjecture as to the true nature of the facts to overcome a motion for summary judgment," *Knight* v. *U.S. Fire Ins. Co.*, 804 F.2d 9, 12 (2d Cir. 1986) (quoting *Quarles* v. *General Motors Corp.*, 758 F.2d 839, 840 (2d Cir.1985)). Furthermore, "[m]ere conclusory allegations or denials cannot by themselves create a genuine issue of material fact where none would otherwise exist." *Hicks* v. *Baines*, 593 F.3d 159, 166 (2d Cir. 2010) (quoting *Fletcher* v. *Atex, Inc.,* 68 F.3d 1451, 1456 (2d Cir. 1995) (internal quotation marks and citations omitted)).

## 2. Determinations by the Commissioner of Social Security

In order to qualify for disability benefits under the Act, a claimant must demonstrate his "inability to engage in substantial gainful activity by reason of

any medically determinable physical or mental impairment which can be
expected to result in death or that has lasted or can be expected to last for a
continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *see
also Butts* v. *Barnhart*, 388 F.3d 377, 383 (2d Cir. 2004).  The claimant must
also establish that the impairment is "of such severity that [the claimant] is not
only unable to do his previous work but cannot, considering his age, education,
and work experience, engage in any other kind of substantial gainful work
which exists in the national economy."  42 U.S.C. § 423(d)(2)(A).  Furthermore,
the disability must be "demonstrable by medically acceptable clinical and
laboratory diagnostic techniques."  *Id.* § 423(d)(3).

The presiding ALJ has an affirmative obligation to develop the
administrative record.  *See Lamay* v. *Comm'r of Soc. Sec.*, 562 F.3d 503, 508-09
(2d Cir. 2009); *Casino-Ortiz* v. *Astrue*, No. 06 Civ. 155 (DAB) (JCF), 2007 WL
2745704, at *7 (S.D.N.Y. Sept. 21, 2007) (citing *Perez* v. *Chater*, 77 F.3d 41, 47
(2d Cir. 1996)).  This means that the ALJ must seek additional evidence or
clarification when the "report from [claimant's] medical source contains a
conflict or ambiguity that must be resolved, the report does not contain all the
necessary information, or [it] does not appear to be based on medically
acceptable clinical and laboratory diagnostic techniques."  20 C.F.R.
§§ 404.1512(e)(1), 416.912(e)(1).

In reviewing the final decision of the Social Security Administration (the
"SSA"), a district court may "enter, upon the pleadings and transcript of the
record, a judgment affirming, modifying, or reversing the decision of the

Commissioner of Social Security, with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g). A court must uphold a final SSA determination to deny benefits unless that decision is unsupported by substantial evidence or is based on an incorrect legal standard. *Selian* v. *Astrue,* 708 F.3d 409, 417 (2d Cir. 2013) ("In reviewing a final decision of the SSA, this Court is limited to determining whether the SSA's conclusions were supported by substantial evidence in the record and were based on a correct legal standard." (quoting *Talavera* v. *Astrue*, 697 F.3d 145, 145 (2d Cir. 2012))); *see also* 42 U.S.C. § 405(g) ("If there is substantial evidence to support the determination, it must be upheld."). Where the findings of the SSA are supported by substantial evidence, those findings are "conclusive." *Diaz* v. *Shalala*, 59 F.3d 307, 312 (2d Cir. 1995) ("The findings of the Secretary are conclusive unless they are not supported by substantial evidence." (citing 42 U.S.C. § 405(g))).

"Substantial evidence" is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Talavera*, 697 F.3d at 151 (quoting *Richardson* v. *Perales*, 402 U.S. 389, 401 (1971)). The substantial evidence standard is "a very deferential standard of review — even more so than the clearly erroneous standard." *Brault* v. *Soc. Sec. Admin. Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012) (citation omitted). To make the determination of whether the agency's finding were supported by substantial evidence, "the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which

conflicting inferences can be drawn." *Talavera*, 697 F.3d at 151 (quoting *Mongeur* v. *Heckler*, 722 F.2d 1033, 1038 (2d Cir. 1983) (per curiam)).

**B.    Analysis**

Doria focuses his argument not on what the ALJ included in his opinion, but rather on what he left out.  At his administrative hearing, Doria alleged two distinct potential sources of disability:  his poor mental health history, and a traumatic spinal injury that he alleged has in recent years given rise to chronic pain and weakness in his left upper body.  (*See, e.g.*, SSA Rec. 48, 54-58, 67-71).  The ALJ fully discussed Doria's claimed mental health impairments in his opinion, and Doria does not seem to dispute the ALJ's subsequent findings in regard to his mental RFC.  Rather, Doria points to the dearth of discussion regarding his alleged physical impairments and the purportedly insufficient development of the record by the ALJ as the primary sources of error upon which relief should be granted.  (*See, e.g.*, Pl. Br. 3).  The Court does not find any error regarding the ALJ's development of the record.  However, the ALJ did not fully perform the required two-step process to determine the credibility of Doria's assertions of physical pain.  Furthermore, the ALJ found Doria incapable of his past work due to significant non-exertional limitations, but then declined to use a vocational expert to determine whether substantial jobs existed in the national economy that Doria could perform.  For these reasons, the Court remands for rehearing.

###### 1.      The ALJ Satisfied His Duty to Develop the Record

As the Second Circuit has explained, before an ALJ's opinion can be assessed for support by substantial evidence in the record, a reviewing court must, as a threshold matter,

> satisfy [itself] that the claimant has had "a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purposes of the Act." The need for this inquiry arises from the essentially non-adversarial nature of a benefits proceeding: the [Commissioner] is not represented, and the ALJ, unlike a judge in a trial, must himself affirmatively develop the record.

*Echevarria* v. *Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold* v. *Secretary of HEW*, 463 F.2d 38, 43 (2d Cir. 1972)) (internal citations omitted).  The ALJ's duty to develop the record includes a duty to resolve apparent ambiguities relevant to the ALJ's disability determination, *see Corporan* v. *Comm'r of Soc. Sec.*, No. 12 Civ. 6704 (JPO), 2015 WL 321832, at *30 (S.D.N.Y. Jan. 23, 2015); to seek information to fill in significant temporal gaps, *see Calzada* v. *Astrue*, 753 F. Supp. 2d 250, 273-74 (S.D.N.Y. 2010) (finding that the ALJ failed to adequately develop the record where a two-year gap in the record existed and evidence suggested the claimant's condition likely changed during that period); and to obtain any other "necessary information," 20 C.F.R. §§ 404.1512(e)(1), 416.912(e)(1).

Doria argues that the ALJ failed to fulfill his duty to develop the record fully; indeed, given the emphasis Doria placed on his physical limitations at his hearing, the record is noticeably short on evidence reflecting Doria's physical (as opposed to mental) health.  However, the fact that the record contains

significant gaps does not, in and of itself, indicate a failure on the part of the ALJ.  The Act directs the Commissioner to "make every reasonable effort to obtain from [an] individual's treating physician (or other treating healthcare provider) all medical evidence, including diagnostic tests, necessary in order to properly make [the disability] determination."  42 U.S.C. § 423(d)(5)(B).  The Commissioner's regulations construe "every reasonable effort" to require an initial request for information, as well as one follow-up request.  20 C.F.R. § 404.1512(d)(1); *see also Jones* v. *Apfel*, 66 F. Supp. 2d 518, 523 (S.D.N.Y. 1999) ("'Every reasonable effort' has been defined by the regulations to require an initial request for medical evidence from the medical source, and a follow-up request, followed by a ten-day extension, if the requested evidence has not been received within ten to twenty calendar days.").

Here the record shows that an initial request for medical records was submitted to Doria's primary care physician, Dr. Kevin Maloney, on September 22, 2011.  (SSA Rec. 32).  The Commissioner subsequently submitted a follow-up request to Dr. Maloney on October 3, 2011.  (*Id.*).  Doria's application for disability benefits lists Dr. Maloney as the only physician to have treated Doria for his alleged neck and back injuries since 2002.  (*Id.* at 151-54).  While it is true that "an ALJ may not rely, as factfinders in adversarial proceedings customarily do, on the *absence* of probative evidence supporting the opinions of a claimant's expert, without making an affirmative effort to fill any gaps in the record before him," *Sanchez* v. *Barnhart*, 329 F. Supp. 2d 445, 450 (S.D.N.Y. 2004) (quoting *Thomas* v. *Barnhart*, No. 01 Civ.

518 (GEL), 2002 WL 31433606, at *4 (S.D.N.Y. Oct. 30, 2002)) (emphasis in
*Thomas*), the ALJ here made the requisite affirmative effort to acquire
additional information regarding Doria's injuries.  He was not required to
persist further when no information was forthcoming.

Doria additionally argues that, to the extent that the record contains
gaps that cannot be filled because no treatment occurred, this lack of
treatment cannot be used as evidence against his claimed disability because it
stemmed from his lack of health insurance.  (Pl. Br. 5; *see* SSA Rec. 57
(testimony by Doria that he had only recently regained health insurance at the
time of his hearing in December 2012)).  However, the Court finds two
problems with this assertion.  First, the record indicates that Doria continued
to seek treatment during at least some portion of the period during which he
lacked insurance (*see* SSA Rec. 57-58), and to the extent that Doria received
treatment, the ALJ appropriately sought records from the relevant treatment
providers (*id.* at 32-38).  Second, while a justified failure to seek or follow
through on treatment cannot be used *against* a claimant, neither can a lack of
treatment — justifiable though it may be — serve to bolster an individual's
claim.  The ALJ gives no indication that he actively weighed any failure to seek
treatment against Doria, and consequently the cases cited by Doria regarding
justifiable failure to follow treatment plans are off-base.  (*See* Pl. Br. 5 (citing,
*inter alia*, *Pimenta* v. *Barnhart*, No. 05 Civ. 5698 (JCF), 2006 WL 2356145, at *6
(S.D.N.Y. Aug. 14, 2006); *McFadden* v. *Barnhart*, No. 94 Civ. 8734 (RPP), 2003
WL 1483444, at *8 (S.D.N.Y. Mar. 21, 2003))).  The ALJ observed the lack of

objective medical evidence to support Doria's claim and moved forward to consider the information actually available.  (SSA Rec. 15).  He could do no more.

Finally, the Commissioner actively supplemented the record by acquiring a consultative examination regarding Doria's physical health.  (SSA Rec. 182-86, 205-09).  Dr. Barbara Akresh submitted a Physical Residual Functional Capacity Assessment in which she diagnosed Doria with cervical disc disease (*id.* at 205), but found that Doria nevertheless retained a physical RFC to perform medium work (*id.* at 210).  In her report she indicated that Doria could occasionally lift up to 50 pounds, frequently lift 25 pounds, and either sit or stand for six hours a day, respectively.  (*Id.* at 206).  She observed a decreased range of motion in his cervical spine on lateral flexion and rotation to the left, as well as some muscle tenderness on his left trapezius and paraspinal muscles, but otherwise found Doria's physical condition to be normal and his strength and dexterity to be intact.  (*Id.*).  She opined that his allegations of back and neck pain were consistent with her medically determinable impairment findings, but not to the severity he alleged.  (*Id.* at 208).

In sum, while the record substantially lacks current information about Doria's physical injuries and any related treatment he has received, this paucity of evidence does not indicate error by the ALJ.  The ALJ sought the relevant records, to the extent they existed; he did not use a lack of evidence as an affirmative indication of Doria's ability to work; and a consultative physical

examination was performed.  The ALJ adequately developed the record, and the Court cannot credit Doria's assertions to the contrary.

### 2. The ALJ's Finding That Doria Suffered No Medically Determinable Physical Impairment Was Not Supported by Substantial Evidence

When considering the appropriate weight to give a claimant's reports of the limiting effects of his own pain or other symptoms, an ALJ must apply a two-step process:  (i) he must first determine whether objective medical evidence supports an underlying impairment that could reasonably be expected to give rise to the claimed symptoms, and (ii) he must subsequently evaluate the intensity, persistence, and limiting effect of the claimant's symptoms to determine the extent to which they limit the claimant's functioning.  *See* 20 C.F.R. § 404.1529.  The ALJ correctly applied this analysis in regards to Doria's asserted mental health symptoms, and Doria's brief does not claim otherwise.  (*See* SSA Rec. 16-18; *see generally* Pl. Br.).

The ALJ did not, however, make a sufficient assessment of Doria's credibility in regards to Doria's reported physical symptoms.  At stage two of his analysis, the ALJ found that Doria suffered no severe physical impairment, and from that point on he declined to address Doria's neck and back injuries anywhere in the remainder of his opinion — having found that Doria did not meet the initial "underlying impairment" requirement of the credibility determination, the ALJ did not need to consider Doria's claims regarding the severity of his symptoms.  But, in making the dispositive finding on prong one of the credibility determination, the ALJ failed to take into account the

objective medical evidence in the record.  Dr. Akresh's consultative examination report explicitly stated that Doria's allegations of back and neck pain were "consistent with [medically determinable impairments]" found in her exam, just "not to the degree of severity alleged."  (SSA Rec. 208).  Hence the only recent physical report in the record — conducted by the SSA's own contracted examiner — supported the existence of *some* medically determinable impairment.  Additionally, the report from Dr. Thomas Lansen, the physician who treated Doria after his 2002 fall, confirms that Doria did indeed sustain a serious traumatic spinal injury.  (*Id.* at 39-40).  This injury concededly occurred over a decade prior to Doria's alleged period of disability, but when paired with the report from Dr. Akresh, it provides further objective evidence supporting the existence of an underlying physical condition that could reasonably give rise to Doria's alleged symptoms.  Given this, the ALJ's unexplained, summary statement that "[t]he claimant has alleged a history of trauma to the neck and shoulders, but there is no objective medical evidence to support any related impairments," lacks substantial evidence.  (SSA Rec. 15).  The ALJ was thus not entitled to cut off his analysis and ignore, without further discussion, Doria's assertions regarding the limiting effects of his pain.

The Court emphasizes that the ALJ did not have to find Doria's account of his physical symptoms credible; he did, however, have to conduct the appropriate analysis, take account of the available objective medical evidence, and put his reasoning on the record.  *See Meadors* v. *Astrue*, 370 F. App'x 179, 184 (2d Cir. 2010) (summary order) (remanding where the ALJ failed to apply

the two-step credibility analysis and stating that "[b]ecause the ALJ neglected to engage in the proper legal standard we cannot subject his determination to meaningful review"); *Martin* v. *Astrue*, No. 07 Civ. 3911 (LAP), 2009 WL 2356118, at *10 (S.D.N.Y. July 30, 2009) (finding that because the ALJ failed to apply the two-step credibility analysis, it was impossible for a reviewing court to determine where the ALJ found the claimant had failed to carry her burden).  Because the ALJ did not do so, the Court remands for further consideration of Doria's alleged physical symptoms under the appropriate two-part framework.

### 3.   The ALJ Incorrectly Relied on the Medical-Vocational Rules Rather Than Employing a Vocational Expert

Once a claimant establishes that his medical impairments preclude him from performing his past work, the ALJ has the burden of proving that the claimant retains "'a residual functional capacity to perform alternative substantial gainful work which exists in the national economy.'"  *Roma* v. *Astrue*, 468 F. App'x 16, 20 (2d Cir. 2012) (summary order) (quoting *Bapp* v. *Bowen*, 802 F.2d 601, 604 (2d Cir. 1986)).  "The ALJ ordinarily meets this burden by utilizing the applicable medical vocational guidelines, although sole reliance on the guidelines may be inappropriate where the claimant's exertional impairments are compounded by nonexertional impairments."  *Id.*

The Second Circuit has held that the presence of nonexertional impairments does not automatically require the testimony of a vocational expert; rather, the question is whether "a claimant's nonexertional impairments 'significantly limit the range of work permitted by his exertional limitations.'"

*Bapp*, 802 F.2d at 605 (quoting *Blacknall* v. *Heckler*, 721 F.2d 1179, 1181 (9th
Cir. 1983) (per curiam)); *accord Vargas* v. *Astrue*, No. 10 Civ. 6306 (PKC), 2011
WL 2946371, at *13 (S.D.N.Y. July 20, 2011) (citing *Zabala* v. *Astrue*, 595 F.3d
402, 410 (2d Cir. 2010)).  A nonexertional impairment "'significantly limit[s]' a
claimant's range of work when it causes an 'additional loss of work capacity
beyond a negligible one or, in other words, one that so narrows a claimant's
possible range of work as to deprive him of a meaningful employment
opportunity.'" *Zabala*, 595 F.3d at 411 (alteration in original) (quoting *Bapp*,
802 F.2d at 605-06).

The ALJ notes in his opinion that under SSR 96-9(p) and 85-15, "the
ability to understand and follow only simple instructions would not
significantly erode the unskilled occupational base." (SSA Rec. 19).  This is
true.  However, Doria's nonexertional limitations, as identified by the ALJ, go
beyond solely the need for simple instructions.  Rather, the ALJ found that
Doria could perform medium work, with the caveat that such work consist of
"simple, routine, and repetitive tasks with no production requirements or
quotas [and] *where the work is isolated with only occasional interaction with
coworkers, and no public interaction*." (SSA Rec. 16 (emphasis added)).
According to SSR 85-15,

> Where a person's only impairment is mental, is not of
> listing severity, but does prevent the person from
> meeting the mental demands of past relevant work and
> prevents the transferability of acquired work skills, the
> final consideration is whether the person can be
> expected to perform unskilled work.  The basic mental
> demands of competitive, remunerative, unskilled work
> include   the   abilities   (on   a   sustained   basis)   to

23

> understand, carry out, and remember simple
> instructions; *to respond appropriately to supervision,*
> *coworkers, and usual work situations*; and to deal with
> changes in a routine work setting.  A substantial loss of
> ability to meet *any* of these basic work-related activities
> would severely limit the potential occupational base.
> This, in turn, would justify a finding of disability
> because even favorable age, education, or work
> experience will not offset such a severely limited
> occupational base.

*Id.* (emphases added).  While the limitation to plain instructions might not place a significant restriction on the available range of unskilled medium work, the further limitations identified by the ALJ — particularly Doria's impaired ability to deal with co-workers and the public — could reasonably be expected to interfere with a more substantial segment of the unskilled occupational base.  The SSA's rulings explicitly recognize this, indicating that an inability to interact with co-workers would in and of itself be grounds for a finding of disability.  *See* SSR 85-15.

The Court is not saying that Doria necessarily falls into the category of *per se* disabled due to his social limitations; the ALJ determined that Doria could have at least "occasional" co-worker interaction (SSA Rec. 16), and Doria's testimony indicates that he can manage small-group interactions with established acquaintances (*id.* at 50-52).  But the fact remains that the restrictions contained within Doria's mental RFC, as determined by the ALJ, would seem to impose at the very least a non-negligible limitation upon the range of unskilled work available to him.[7]  The ALJ bore the burden of

---

[7]     The ALJ broadly states that "the additional limitations have little or no effect on the occupational base of unskilled medium work." (SSA Rec. 19).  However, the ALJ fails to

establishing that jobs exist in the national economy that Doria could perform, and, given the ALJ's RFC finding, his failure to employ a vocational expert constituted error.  *See, e.g., Zabala*, 595 F.3d at 410 ("[W]here the claimant's nonexertional limitations 'significantly limit the range of work permitted by his exertional limitations,' the ALJ is required to consult with a vocational expert." (quoting *Bapp*, 802 F.2d at 605)); *Selian,* 708 F.3d at 421 ("We have explained that the ALJ cannot rely on the Grids [i.e., the Medical-Vocational Guidelines] if a non-exertional impairment has any more than a 'negligible' impact on a claimant's ability to perform the full range of work, and instead must obtain the testimony of a vocational expert."); *Rosa* v. *Callahan,* 168 F.3d 72, 82 (2d Cir. 1999) ("Where significant nonexertional impairments are present at the fifth step in the disability analysis … 'application of the grids is inappropriate.' Instead, the Commissioner 'must introduce the testimony of a vocational expert (or other similar evidence) that jobs exist in the economy which claimant can obtain and perform.'" (quoting and citing *Bapp,* 802 F.2d at 603, 605-06))); *see also Martinez* v. *Colvin*, No. 13 Civ. 7254 (KPF), 2015 WL 4041988, at *16 (S.D.N.Y. July 2, 2015) (remanding for consideration of vocational expert testimony where ALJ improperly relied upon SSR 85-15 and failed to

---

specify what "additional limitations" he is referring to, and the preceding portion of his opinion considers only the limitation to simple instructions.  The ALJ's summary conclusion that the occupational base remains intact, without explanation or consideration of previously identified restrictions, is insufficient.  *See Pratts* v. *Chater*, 94 F.3d 34, 39 (2d Cir. 1996) (finding the ALJ's conclusory statement that claimant's non-exertional limitations did not significantly erode the unskilled occupational base insufficient absent explanation or use of vocational expert testimony).

adequately explain the basis of his determinations as to the erosion of the occupational base).

## CONCLUSION

For the foregoing reasons, the Commissioner's decision is reversed and remanded for rehearing; Plaintiff's motion for summary judgment is GRANTED to the extent that it requests a remand for rehearing; and Defendant's motion for judgment on the pleadings is DENIED.  The Clerk of Court is directed to terminate all pending motions, adjourn all remaining dates, and close this case.

SO ORDERED.

Dated:      September 22, 2015
            New York, New York

_____
KATHERINE POLK FAILLA
United States District Judge